## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ARIANNE GALLAGHER, on behalf of herself and others similarly situated,<br><br>                Plaintiff,<br><br>        v.<br><br>PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY, d/b/a FEDLOAN SERVICING,<br><br>                Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)      **CLASS ACTION COMPLAINT**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>CLASS ACTION COMPLAINT</u>

Arianne Gallagher, as a federal student loan holder, brings this suit against Pennsylvania Higher Education Assistance Agency, d/b/a FedLoan Servicing ("PHEAA" or "Defendant") on behalf of herself and others similarly situated, and alleges the following based on her personal knowledge and investigation of counsel.

## <u>INTRODUCTION</u>

### FEDERAL STUDENT LOANS

1.    Since 1965, federally guaranteed student loans have been available either through the Federal Family Education Loan ("FFEL") or William D. Ford Direct Student Loan ("Direct Loan") programs. This federal assistance is designed to expand access to higher education.

2.     Congress created the FFEL program in 1965. Under the FFEL program, private lenders originated loans to postsecondary students. The federal government made payments to those lenders, guaranteed them against significant loss in case of default, and provided funds to help administer the loans.

3.     FFEL loans include Subsidized Federal Stafford Loans, Unsubsidized Federal Stafford Loans, FFEL PLUS Loans, and FFEL Consolidation Loans.[1]

4.     Although no new FFEL loans have been made since June 30, 2010, loans originated and disbursed on or before that date are still serviced today.

5.     The Department of Education (the "Department") began originating student loans to borrowers in 1994 under the Direct Loan program. In the Direct Loan program, eligible borrowers receive loans that are nearly identical to FFEL loans. The Department administers Direct Loans, which are funded through the U.S. Treasury.

6.     There are four types of Direct Loans, including Direct Subsidized Loans, Direct Unsubsidized Loans, Direct PLUS Loans, and Direct Consolidation Loans.[2]

## REPAYMENT OPTIONS

7.     A number of repayment options are available for the millions of borrowers in the United States who've taken out FFEL and/or Direct Loans. Under

---

[1] Federal Student Aid: An Office of the U.S. Department of Education, *Glossary* (available at https://studentaid.ed.gov/sa/glossary#letter_f) (last accessed Nov. 18, 2017).
[2] Federal Student Aid: An Office of the U.S. Department of Education, *Loans* (available at https://studentaid.ed.gov/sa/types/loans) (last accessed Nov. 18, 2017).

the 10-year Standard Repayment Plan, borrowers' monthly payments are fixed and calculated to allow borrowers to repay their debt in ten years.

8.     Recognizing the challenges that student borrowers face when repaying their loans under the 10-year Standard Repayment Plan, the federal government also offers multiple Income Driven Repayment ("IDR") plans that help borrowers manage their student loan debt. These plans include Income-Contingent Repayment ("ICR"), Income-Based Repayment ("IBR"), Pay as You Earn Repayment ("PAYE"), and Revised Pay as You Earn Repayment ("REPAYE") (collectively, the "IDR plans").

9.     To enroll in an IDR plan, borrowers must submit an Income-Driven Repayment (IDR) Plan Request ("IDR Request Form").

10.     Borrowers with Direct Loans are eligible to apply for all four IDR plans. Borrowers with FFEL loans may apply for the IBR plan, only. However, a borrower may consolidate her FFEL loans into a Direct Consolidation Loan, in which case the borrower will be eligible for all four IDR plans.

11.     Several qualities make the IDR plans attractive to student loan borrowers. First, a borrower's monthly payment amount is based on her annual income and family size. This adjusted payment amount is designed to provide a more affordable monthly payment than is available under the 10-year Standard Repayment plan.

12.     Second, each IDR plan forgives the outstanding balance on eligible loans after the borrower makes a certain number of qualifying monthly payments

3

("Qualifying Payments"). To qualify for forgiveness, borrowers must make 25 years of Qualifying Payments under ICR; 20 or 25 years under IBR; 20 years under PAYE, and 20 or 25 years under REPAYE.

13.    Borrowers who work in public service may qualify for loan forgiveness ahead of the IDR plans' standard schedules.

14.    In 2007, Congress created the Public Service Loan Forgiveness ("PSLF") program to encourage individuals to enter full-time public service employment. Under the program's terms, the Department will forgive the balance of borrowers' Direct Loans if they meet several qualifications. In short, borrowers must make payments under a qualifying repayment plan—including any of the IDR plans above—while employed full time in a qualifying public service job. However, rather than the standard schedules, the Department will forgive the balance of these borrowers' Direct Loans after just 120 monthly payments.

15.    Months during which FFEL and Direct Loans are in forbearance do not qualify towards loan forgiveness under the IDR plans or PSLF program.

16.    The IBR, PAYE, and REPAYE plans have additional benefits. Under these plans, if a borrowers' monthly payment amount does not cover all of the interest that's accrued and owed, then the government will pay a Federal Interest Subsidy to cover all or a portion of the remaining unpaid accrued interest.

17.    The government does not pay the remaining interest during periods of forbearance. However, despite this fact, forbearance periods count against the three-

year caps these plans set in some circumstances. *See* 34 C.F.R. § 685.209(a)(2)(iii).[3]

## PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY

18.     The Pennsylvania General Assembly created PHEAA in 1963 as a public corporation and government instrumentality with a mission to improve higher education opportunities for Pennsylvania residents.

19.     Today, "PHEAA conducts its student loan servicing operations commercially as American Education Services (AES)."[4]

20.     Decades later, PHEAA added to its commercial operations, launching a national student loan servicing company, FedLoan Servicing ("FedLoan"), to service federally owned loans originated under the Direct Loan program.[5]

21.     In 2009, the Department awarded PHEAA a Federal Loan Servicing Contract to service federally-owned loans nationally.

22.     In addition to servicing its Direct Loan program, the Department

---

[3]*See also Income-Driven Repayment Plans: Questions and Answers*, Federal Student Aid Office, p. 2 (available at https://studentaid.ed.gov/sa/sites/default/files/income-driven-repayment-q-and-a.pdf) (last accessed Nov. 17, 2017) ("The REPAYE, PAYE, and IBR plans offer an interest benefit if your monthly payment doesn't cover the full amount of interest that accrues on your loans each month. Under all three plans, the government will pay the difference between your monthly payment amount and the remaining interest that accrues on your subsidized loans for up to three consecutive years from the date you begin repaying the loans under the plan. Under the REPAYE Plan, the government will pay half of the difference on your subsidized loans after this three-year period, and will pay half of the difference on your unsubsidized loans during all periods.").

[4] See http://www.aessuccess.org/index.shtml (footer) (last accessed Nov. 19, 2017).

[5] See https://myfedloan.org/ (footer) ("PHEAA conducts its student loan servicing operations for federally-owned loans as FedLoan Servicing.") (last accessed Nov. 19, 2017).

awarded PHEAA an exclusive contract in 2012 to service the PSLF program and the Teacher Education Assistance for College and Higher Education ("TEACH") Grant program.

23.    The TEACH program provides financial grants to students who display "high academic aptitude," pursue teaching careers in low-income schools for at least four years, and teach subjects in high-needs fields, like math or science.

24.    Today, PHEAA manages over a quarter of the $1.4 trillion in student loan debt owed by millions of borrowers across the United States.

25.    With these major additions to PHEAA's commercial services, PHEAA's national loan servicing business now dwarfs its statutorily-mandated commitment to Pennsylvania residents.

26.    Indeed, the Fourth Circuit found that PHEAA is not an arm-of-the-state, holding "PHEAA is a very wealthy corporation engaging in nationwide commercial student-loan financial-services activities." *Oberg v. PHEAA ("Oberg III")*, 804 F. 3d 646, 677 (4th Cir. 2015).

27.    The revenue PHEAA earns by servicing the Direct Loan program, alone, is staggering. According to PHEAA's most recent financial statement:

> For the nine months end[ing] March 31, 2017; [Direct Loan] servicing fees were $145.5 million, a 5.2% increase from $138.3 million in 2016. For the nine months end[ing] March 31, 2017, the average FLS [FedLoan] servicing portfolio of loans was $278.6 billion, a 15.0% increase from $242.2 billion in 2016. For the nine months end[ing] March 31, 2017, the average number of total unique borrowers in the [Direct Loan] portfolio was 7.6 million, a 1.3% increase from 7.5 million

in 2016.[6]

## PHEAA'S DUTY TO BORROWERS

28.     PHEAA's contract with the Department obligates it to help borrowers apply for and remain enrolled in a chosen IDR plan. Indeed, the Student Aid Office obligates federal loan servicers, like PHEAA, to work alongside borrowers, helping them learn about, determine eligibility, and apply for IDR plans. The Student Aid Office explains:

a.     "Why pay for help with your federal student loans when your loan servicer will help you for FREE? Contact your servicer to apply for income-driven repayment plans, student loan forgiveness, and more."[7]

b.     "Before you apply for an income-driven repayment plan, contact your loan servicer if you have any questions. Your loan servicer will help you decide whether one of these plans is right for you."[8]

c.     "To apply, you must submit an application called the Income-Driven Repayment Plan Request…The application allows you to select an income-driven repayment plan by name, or to request that your loan servicer determine what

---

[6] PHEAA's Quarterly Financial Report for March 31, 2017 and 2016, at 18 (available at   https://www.pheaa.org/about/pdf/financial-reports/quarterly/033117.pdf)   (last accessed August 4, 2017).

[7] *Income-Driven Plans*, Federal Student Aid (last visited, Jun. 28, 2017), https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven.

[8] *Id.*

income-driven plan or plans you qualify for, and to place you on the income-driven plan with the lowest monthly payment amount."[9]

29.     The IDR Request Form also instructs borrowers to contact their loan servicer: "If you need help with this form, contact your loan holder or servicer for free assistance."[10]

30.     Since at least 2015, the Department has emailed borrowers immediately after submitting an IDR Request Form, providing, "[i]f you have questions regarding the next steps in the processing of your application, or wish to cancel the application, contact your servicer(s)."

31.     From start to finish, making servicers available to borrowers during the IDR Request process is an important objective for the Department because some organizations offer these services for a fee. For example, the Student Aid Office website informs borrowers, "You Don't Have To Pay for Help With Your Student Loans[,]" instead directing borrowers to "take care of yourself for free by contacting your loan servicer" for help with a variety of services including, to "[c]hange your repayment plan" and "postpone monthly payments while you're furthering your education or are unemployed."[11]

---

[9] *Id.*

[10] A copy of the Income-Driven Repayment (IDR) Plan Request form can be found at: https://static.studentloans.gov/images/idrPreview.pdf (last accessed Nov. 19, 2017).

[11]     *See   Avoid   Scams*,   Federal   Student   Aid   Office   (available   at https://studentaid.ed.gov/sa/types/scams#dont-pay-for-help (last accessed Nov. 19, 2017).

## ANNUAL RECERTIFICATION

32.     After enrolling in an IDR plan, borrowers must recertify their eligibility every twelve months by submitting a new IDR Request Form.[12]

33.     According to the Student Aid Office, it should take student loan servicers "a few weeks" to process a borrower's IDR Request Form.[13]

34.     Unfortunately, PHEAA often takes far longer than they should to process IDR Request Forms. What's more, it is also common for PHEAA to processes borrowers' IDR Request Forms incorrectly and improperly, triggering even more devastating consequences to borrowers' accounts.

## PHEAA'S SERVICING MISMANAGEMENT

35.     PHEAA's backlog in processing IDR Request Forms has been widely reported. For example, The Washington Post wrote:

> Officials at the department say the majority of servicers are meeting or exceeding the target turnaround time of 15 days. However, FedLoan, which primarily handles borrowers seeking public service loan forgiveness, has a significant backlog[.][14]

---

[12] The Student Aid Office explains, "[t]o recertify, you must submit a new Income-Driven Repayment Plan Request. You'll be asked to select the reason for submitting the application. Respond that you are submitting documentation of your income for the annual recalculation of your payment amount." Borrowers may also use the recertification process to switch IDR plans. *See Income-Driven Repayment Plans: Questions and Answers*, Federal Student Aid Office, p. 20 (available at https://studentaid.ed.gov/sa/sites/default/files/income-driven-repayment-q-and-a.pdf) (last accessed Nov. 19, 2017).

[13] *Id*. at 22.

[14] Danielle Douglas-Gabriel, *Delays. Backlogs. Confusing applications. Obama's latest student loan plan is having growing pains*. Washington Post, Apr. 5, 2016 (available at https://www.washingtonpost.com/news/grade-

36.    The Consumer Financial Protection Bureau ("CFPB") also reported on borrowers' complaints about processing backlogs.

> Over this reporting period, federal student loan borrowers submitted complaints when unable to enroll in an IDR plan several months after submitting an application. These borrowers reported processing delays and lost application documents, resulting in unnecessary forbearance and an inability to make qualified payments towards loan forgiveness. Some of these complaints suggest that servicing problems are preventing borrowers from making qualified payments in pursuit of Public Service Loan Forgiveness.[15]

37.    PHEAA is aware of, but has failed to rectify, these delays. Instead, PHEAA has consistently shifted the consequences of its failing service system onto borrowers, at its own financial gain.

38.    To accommodate its delayed and improper processing of IDR Request Forms, PHEAA puts borrowers' accounts into Administrative Forbearance.

39.    Administrative Forbearance is sometimes referred to as General Forbearance or Discretionary Forbearance. According to the Student Aid Office, PHEAA "decides whether or not to grant a request for a general forbearance. For this reason, a general forbearance is sometimes called a 'discretionary forbearance.'"

40.    Indeed, IDR Request Forms freely authorize PHEAA to put a borrower's

---

point/wp/2016/04/05/delays-backlogs-confusing-applications-obamas-latest-student-loan-plan-is-having-growing-pains/?utm_term=.2e1bb3620545) (last accessed Nov. 17, 2017)

[15] CFPB, *Annual Report of the Student Loan Ombudsman*, Oct. 2017 (available at http://files.consumerfinance.gov/f/documents/cfpb_annual-report_student-loan-ombudsman_2017.pdf) (last accessed Nov. 17, 2017).

accounts into "forbearance while processing [her] application[.]"

41.    Aside from its processing delays, other servicing failures prompt PHEAA to place borrowers' loans into others types of forbearance, when such placement is not to the borrowers' benefit.

42.    During periods of either forbearance type, a borrower's "loan payments are temporarily suspended or reduced."[16] Without payments being made, additional interest accrues.

43.    The accrued interest on borrowers' accounts may or may not capitalize during periods of Administrative Forbearance. Accrued interest capitalizes after periods of all other types of forbearance.

## HARM TO BORROWERS

44.    Every forbearance has damaging consequences.

45.    PHEAA has discretion to cap the number of months a borrower's Direct Loans and FFEL loans may be placed into forbearance.

46.    As a result, by placing a borrower's loan into forbearance when PHEAA's own mismanagement prevents it from processing IDR Request Forms correctly or timely, PHEAA exhausts the borrower's forbearance eligibility in the future, when she may actually need it.

47.    What's more, not only does PHEAA's mismanagement accelerate

---

[16] Federal Student Aid: An Office of the U.S. Department of Education, *Glossary* (available at https://studentaid.ed.gov/sa/glossary#letter_f) (last accessed Nov. 18, 2017).

borrowers' exhaustion of their forbearance eligibility, it also prolongs their journey to loan forgiveness.

48.   Because forbearance is not a qualifying repayment option, PHEAA's mismanagement deprives borrowers the opportunity to make Qualifying Payments under their chosen IDR plan or, if they are enrolled, the PSLF program.

49.   These borrowers, who include public service employees, low-income borrowers, and others suffering financial hardship, have lost months that would otherwise count towards achieving loan forgiveness, thus prolonging the life of their repayment obligations.

50.   By placing a borrower's loan into forbearance, PHEAA's mismanagement also blocks the Federal Interest Subsidy the Department otherwise pays on the borrower's behalf.

51.   Except in some circumstances of Administrative Forbearance, PHEAA's forbearance-driven servicing model further injures borrowers by increasing their overall principal and monthly payment amount. The Student Aid Office explains,

> During forbearance, principal payments are postponed but interest continues to accrue. Unpaid interest that accrues during the forbearance will be added to the principal balance (capitalized) of your loan(s), increasing the total amount you owe.[17]

52.   Forbearance triggers the capitalization of not just the interest that accrues during the forbearance period, but all interest that has accrued over the life

---

[17] *Id.*

the loan.

53. This capitalized interest is devastating, "potentially increasing loan balances by hundreds or even thousands of dollars."

54. As a result of this change in principal, PHEAA's placement of a borrower's loan into forbearance also "may cause [her] monthly payment amount to increase."[18]

55. Where PHEAA costs borrowers the advantage of Federal Interest Subsidies, or the opportunity to make Qualifying Payments toward loan forgiveness, PHEAA does not remedy their accounts. As a result, borrowers bear the brunt of PHEAA's servicing failures.

## PHEAA'S FINANCIAL GAIN

56. Meanwhile, PHEAA has saved untold sums of money by employing too few personnel to process its borrowers' IDR Request Forms timely and properly.

57. PHEEA also appreciates a financial benefit in the form of interest subsidies and special allowances it receives for servicing FFEL loans.

58. In addition to these immediate financial payouts, PHEAA's mismanagement described herein also pads the long-term accounts receivable of its balance sheet. Unless the Department transfers PHEAA's growing portfolio of 7.6 million borrowers to another servicer, PHEAA will profit on the backend of the FFEL

---

[18] Federal Student Aid: An Office of the U.S. Department of Education, *Glossary* (available at https://studentaid.ed.gov/sa/glossary#letter_c) (last accessed Nov. 18, 2017).

and Direct Loans it detours into forbearance. This is because PHEAA will collect additional service fees to which it would not be entitled but for extending the life of borrowers' repayment period beyond the forgiveness schedules the IDR plans and PSLF program set.

59.    To this end, under their current contract, the Department pays PHEAA $2.85 per month to service a federal loan in repayment status, and $1.05 per month to service a federal loan in forbearance.

60.    PHEAA is aware of, but has failed to rectify, this mismanagement. Instead, PHEAA has consistently shifted the consequences of its failing service system onto borrowers, at its own financial gain. The relief Ms. Gallagher seeks is necessary to remedy borrower harm and to prevent future harms.

## JURISDICTION AND VENUE

61.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, which affords federal courts with original jurisdiction over cases where any member of the plaintiff class is a citizen of a state different from any defendant, and where the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Plaintiff, being a resident of the District of Columbia, is diverse from PHEAA, which is headquartered and incorporated in Pennsylvania. Plaintiff asserts that, in the aggregate, the claims of all Class members exceed $5,000,000, exclusive of interest and costs.

62.    This Court has supplemental jurisdiction over pendant state law claims

pursuant to 28 U.S.C. § 1367(a).

63.   This Court has personal jurisdiction over PHEAA because PHEAA has established minimum contacts within Pennsylvania, having its headquarters in the Commonwealth.

64.   This Court is the proper venue for this case pursuant to 28 U.S.C. §§ 1391(b) and (c) because PHEAA is headquartered in this District.

## THE PARTIES

65.   Plaintiff Arianne Gallagher is a resident of the District of Columbia. Plaintiff obtained various loans to help her pay for post-secondary education, including loans under the Direct Loan and FFEL programs. PHEAA services Plaintiff's student loans. Plaintiff has worked fulltime in PSLF-qualifying public service positions since her graduation from law school in 2011. During this time, Plaintiff has made continuous, on-time, monthly payments pursuant to her PSLF-qualifying IDR plan, which she has recertified via IDR Request Forms annually.

66.   PHEAA is a national student loan servicer with headquarters located at 1200 North 7th Street, Harrisburg, Pennsylvania 17102.

## FACTUAL ALLEGATIONS

### PLAINTIFF'S LOAN HISTORY

67.   Plaintiff attended the University of Pittsburgh from 2004 to 2008, where she obtained a Bachelor of Arts in both Political Science and Communication. Upon graduation, Plaintiff attended the University of Pittsburgh School of Law, where she

earned a Juris Doctorate in 2011.

68.     From 2004 to 2010, Plaintiff applied for and received sixteen federal student loans to help pay the costs of her post-secondary education. These loans include Federal Perkins, Stafford Unsubsidized, Stafford Subsidized, FFEL PLUS Graduate, Direct PLUS Graduate, Direct Stafford Subsidized, and Direct Stafford Unsubsidized loans.

69.     PHEAA has serviced Plaintiff's loans since September 30, 2004 under its commercial servicing arm, AES.

70.     After graduating law school in 2011, Plaintiff consolidated her federal loans under the Direct Consolidation Loan Program, resulting in two new loans: a Direct Subsidized Consolidation Loan, and a Direct Unsubsidized Consolidation Loan.

71.     Pursuant to this consolidation, the Department paid off the student loans then serviced by AES on December 9, 2011, in full.

72.     Following this payment, the Department managed Plaintiff's Direct Consolidation Loans until June 24, 2013, at which time the Department transferred Plaintiff's Direct Consolidation Loans back to PHEAA, under its federal loan servicing arm, Fedloan.

73.     PHEAA has serviced Plaintiff's Direct Consolidation Loans since.

74.     Today, more than six years after her law school graduation, Plaintiff's student loan balance has *grown* to more than $160,000.

## PLAINTIFF'S EMPLOYMENT HISTORY

75.     While Plaintiff's student loans bounced from one servicer to the next, she relocated to the country's capital and began a career in public service. Since 2012, Plaintiff has served the federal government in various capacities, including as a Program Advisor to the U.S. Chief Technology Officer, and a Policy Advisor for the U.S. Office of Personnel Management. Today, Plaintiff serves as a Director-Program Manager in the Office of Presidential Fellowships.

76.     All of Plaintiff's employment during this time has qualified for the PSLF program.

## PLAINTIFF'S LOAN REPAYMENT

77.     Plaintiff applied for IBR enrollment on or about November 22, 2011. She submitted her Alternative Documentation of Income form on or about January 2, 2012. On this form, Plaintiff confirmed her request for IBR enrollment.

78.     Since the Department's transfer of her loans back to PHEAA on June 24, 2013, Plaintiff has submitted IDR Request Forms on four occasions, typically around the end of January each year.

79.     On at least three of these occasions, Plaintiff has been injured when PHEAA failed to process her IDR Request Forms in accordance with its duties to her under PHEAA's contract with the Department of Education.

**Plaintiff's 2014 IDR Request Form**

80.    Plaintiff submitted her 2014 IDR Request Form to PHEAA on January 22, 2014.

81.    Under Section 2: Repayment Plan Request, Plaintiff checked box 1(b), which provides: "I am submitting annual documentation for the recalculation of my monthly payment amount under my current repayment plan – Continue to item 2."

82.    Plaintiff's 2014 IDR Request Form did not request any changes to her repayment plan.

83.    Despite the straightforward nature of Plaintiff's 2014 IDR Request Form, PHEAA did not process Plaintiff's 2014 IDR Request Form properly.

84.    PHEAA placed Plaintiff's Direct Consolidation Loans into forbearance for the February 2014 pay period.

85.    As a result of PHEAA placing her loans into forbearance, Plaintiff could not make a Qualifying Payment in February 2014.

**Plaintiff's 2016 IDR Request Form**

86.    Plaintiff submitted her 2016 IDR Request Form on or about January 27, 2016.

87.    Plaintiff checked the second box listed under Section 2: Repayment Plan or Recertification Request, which provides: "I am already in an income-driven repayment plan and am submitting documentation for the annual recalculation of my payment – Skip to Item 5."

88.     Plaintiff's 2016 IDR Request Form did not request any changes to her repayment plan.

89.     Rather than serve Plaintiff and process her IDR Request Form consistent with its duty to her under its contract with the Department, PHEAA placed Plaintiff's Direct Consolidation Loans into forbearance from at least March 5, 2016 to April 30, 2016.

90.     By placing Plaintiff's Direct Consolidation Loans into forbearance, PHEAA caused more than $13,000 of interest to capitalize on Plaintiff's loans, adding to her outstanding principal and increasing her monthly payment amount.

91.     Notwithstanding PHEAA's placement of her loans into forbearance, Plaintiff continued making payments of $801.74 in February and March 2016. Plaintiff did not make a payment in April 2016.

92.     As a result of PHEAA placing her loans into forbearance, Plaintiff lost the ability to make Qualifying Payments from at least March to April 2016.

93.     PHEAA returned Plaintiff to her IBR plan, effective May 2016.

### Plaintiff's 2017 IDR Request Form

94.     Plaintiff submitted her 2017 IDR Request Form on January 25, 2017.

95.     As she had in years' past, Plaintiff again checked the second box of Section 2: Repayment Plan or Recertification Request, which provides: "I am submitting documentation for the <u>annual recertification</u> of my income-driven payment – Skip to Item 5."

96.   Plaintiff's 2017 IDR Request Form did not request any changes to her repayment plan.

97.   Sometime after submitting her 2017 IDR Request Form on January 25, 2017 and before February 2, 2017, Plaintiff called PHEAA's toll-free customer service.

98.   Plaintiff asked PHEAA's customer service representative whether she would be better served by enrolling in another repayment plan.

99.   Rather than discuss Plaintiff's options with her over the phone so that she could make an informed decision before switching plans, PHEAA's customer service representative told Plaintiff the only way to compare her options was to apply for a new plan, and compare Plaintiff's repayment obligations under the new plan to those of the old, after the fact.

100.   PHEAA's customer service representative then processed a change to Plaintiff's repayment plan over the phone.

101.   At no time did PHEAA's customer service representative advise Plaintiff that changing plans would cause PHEAA to temporarily place her loans into Standard Repayment, causing Plaintiff's payment to balloon to almost $1,900 per month.

102.   Instead, PHEAA sent Plaintiff the following notification on February 2, 2017, after its customer service representative had steered her into a new plan:

**REPAYMENT PLAN CHANGE REQUIRES PAYMENT.**

We received your request to remove your loans from an Income-Based Repayment (IBR) plan and to repay under another plan. We removed

your loans from IBR and placed them on a Standard Repayment plan. In order to complete your repayment plan change, you are required to make a payment under the Standard repayment plan. If the Standard payment amount is too high, a reduced payment forbearance option may be available. If you qualify, this option allows you to remit a lower payment amount to complete your repayment plan change.

**What's Next**
You will receive a bill for the Standard payment amount and you must remit payment no later than 15 days after the due date. If you can't afford the payment and need to request a reduced payment forbearance, please contact us. If you do not pay or contact us, you will remain on the Standard Repayment plan.

**Good to Know**
After you make the required payment, we will put your account on the repayment plan that you originally selected. We will send you a confirmation letter when that process is complete.

103.   In a flurry of activity, PHEAA then sent Plaintiff three separate letters on February 3, 2017. One letter put Plaintiff's loans into forbearance from February 5, 2017 to February 28, 2017. The second letter put Plaintiff's loans in "Reduced Payment Forbearance" from March 1, 2017 to March 10, 2017. The last letter put Plaintiff's loans on a fixed 10-year Standard Schedule with monthly payments of almost $1,900.

104.   In the wake of her ballooned monthly payment, and PHEAA's placement of her loans into forbearance, Plaintiff again contacted PHEAA's customer service.

105.   Plaintiff demanded that she be returned to her old, IBR repayment plan, immediately, which PHEAA approved on February 4, 2017.

21

106.   Despite returning Plaintiff to IBR on February 4, 2017, PHEAA kept her loans in Administrative Forbearance from at least February 5, 2017 to February 28, 2017 and Reduced Payment Forbearance from March 1, 2017 to March 10, 2017, preventing Plaintiff from making Qualifying Payments in those months.

## PLAINTIFF'S HARM

107.   Plaintiff has suffered both financial harm and emotional stress at the hands of PHEAA's inadequate policies and constant breach of the duties it owed to service her loans properly.

108.   As a result of either its own processing delays, or from having failed to assist Plaintiff generally, PHEAA placed Plaintiff's account into forbearance on three separate occasions, spanning at least five monthly payments, including February 2014, March to April 2016, and February and March 2017.

109.   Her perfect payment record notwithstanding, Plaintiff suffered various injuries as a result of PHEAA's delays, mismanagement, and breach of duties, including the:

(a)   Exhaustion of her eligibility for forbearance in the future, when she may actually need it;

(b)   Denial of the opportunity to take part in alternative repayment plans;

(c)   Denial of the opportunity to make Qualifying Payments, which delays loan forgiveness under both the PSLF program and IBR plan;

(d)     Denial of Federal Interest Subsidies that the Department of Education must contribute on her behalf during repayment;

(e)     Denial of reduced interest rates available for borrowers in repayment status; and

(f)     Capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

## CLASS ALLEGATIONS

110.    Plaintiff brings this action on behalf of herself and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class:

> All individuals who are student loan borrowers from the federal government and who had at least one federal loan serviced by PHEAA and/or any of its assumed names between June 17, 2009 and the present whose accounts PHEAA placed into forbearance and were damaged as a result.

111.    Excluded from the Class are Defendant, as well as its past and present officers, employees, agents or affiliates, any judge who presides over this action, and any attorneys who enter their appearance in this action.

112.    Plaintiff reserves the right to expand, limit, modify or amend the class definition, including the addition of one or more subclasses, in connection with her motion for class certification, or at any other time, based on, among other things, changing circumstances and new facts obtained during discovery.

113.    Numerosity. Consistent with Rule 23(a)(1), the Class is so numerous and

23

geographically dispersed that joinder of all Class members is impracticable. Plaintiff believes that there are tens of thousands, if not more, members of the Class. Class members may be identified through objective means. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

114. <u>Commonality and Predominance</u>. Consistent with Fed. R. Civ. P. 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common question of law and fact that predominate over any questions affecting individual Class members. These common questions include, but are not limited to:

(a) Whether PHEAA's contract with the Department of Education obligated it to inform borrowers of IDR programs, assist with applications for IDR, and determine eligibility for IDR;

(b) Whether borrowers are significantly injured by being placed in forbearance, sometimes prolonged forbearance, rather than being placed in an IDR program;

(c) Whether PHEAA placed borrowers loans into forbearance to accommodate its own servicing delays and other mismanagement; and,

(d) Whether members of the Class were damaged by PHEAA's misrepresentations, omissions, and mismanagement of federal student loans

115. <u>Typicality</u>. Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiff is typical

of members of the Class. Plaintiff is a borrower of student loans from the federal government, serviced by PHEAA, who was placed in forbearance pursuant to PHEAA's common scheme or mismanagement. By being placed in forbearance, the amount Plaintiff and the Class owed was subject to interest increasing the principal balance of the loan instead of placing Plaintiff and the Class in a plan allowing them to make smaller payments over a longer time. Plaintiff's injuries are akin to other class members and Plaintiff seeks relief consistent with the relief owing to the Class

116. <u>Adequacy</u>. Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter to obtain relief for herself and for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff has also retained counsel competent and experienced in complex class action litigation. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

117. <u>Superiority</u>. Consistent with Fed. R. Civ. P 23(b)(3), class action litigation is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual Plaintiff may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class may be relatively small

compared to the burden and expense required to individually litigate their claims against PHEAA, and thus, individual litigation to redress PHEAA's wrongful conduct would be impracticable. Individual litigation by each Class member would also strain the court system, create the potential for inconsistent or contradictory judgments, and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

118.   General Applicability. PHEAA's conduct in failing to process IDR Request Forms correctly or on time, instead placing borrowers' loans into forbearance to accommodate its own interests, is generally applicable to the class as a whole, making certification under Federal Rule of Civil Procedure 23(b)(2) appropriate

## CAUSES OF ACTION

### COUNT I

### *Violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law*

119.   Plaintiff incorporates the allegations contained in the previous paragraphs by reference.

120.   Plaintiff Gallagher brings this claim individually and on behalf of the Class.

121.   Plaintiff and PHEAA are "persons" under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Stat. § 201-1, *et*

*seq.*

122.   PHEAA's student loan servicing business qualifies as a "trade" and "commerce," as the UTPCPL defines those terms. 73 P.S. § 201-2(3).

123.   The services Plaintiff purchased are "services primarily for personal, family, or household purposes." 73 P.S. § 201-9.2.

124.   The UTPCPL declares as unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by subclauses (i) through (xxi) of clause (4) of section 21 of this act." 73 P.S. § 201-3.

125.   Under clause (4), unfair methods of competition and unfair or deceptive acts or practices are defined as "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi).

126.   PHEAA violated the UTPCPL by engaging in fraudulent and deceptive conduct which created the likelihood of confusion and misunderstanding.

127.   Specifically, PHEAA's false and misleading acts and practices include:

(a)   Placing borrowers' accounts into forbearance to accommodate its own servicing failures, or as a result of breaching its duty to assist borrowers;

(b)   Denying borrowers the opportunity to make Qualifying Payments for PSLF and IDR forgiveness when it fails to timely and properly process IDR Request Forms, thereby extending the life of borrowers' loans;

(c)     Failing to properly count borrowers' PSLF and IDR Qualifying Payments;

(d)     Exhausting borrowers' eligibility to request forbearance in the future, when they may actually need it;

(e)     Denying borrowers Federal Interest Subsidies the Department of Education must make on their behalf;

(f)     Triggering the capitalization of borrowers' interest, thereby increasing borrowers' outstanding principal and monthly payment amounts; and

(g)     Collecting amounts not legitimately due and owing and failing to refund them to borrowers.

128.   Plaintiff and all class members suffered ascertainable losses that necessarily flowed directly from PHEAA's fraud or deceit in mismanaging borrowers' IDR Request Forms, including an exhaustion of future forbearance eligibility, a loss of Qualifying Payment months under PSLF and IDR, a denial of Federal Interest Subsidies, an increase in outstanding principal and monthly payment amounts, and the payment of sums not due but for PHEAA's misconduct.

129.   Plaintiff and all class members justifiably relied on PHEAA's knowingly false representations that placement of their loans into forbearance was proper when, in fact, PHEAA intended such placement to accommodate its own interests, only, as a means of covering up its mismanagement and negligence, breaching PHEAA's duty under its contract with the Department of Education.

130.   PHEAA's conduct in this regard was intentional, wrongful, reckless, and outrageous, and PHEAA knew or should have known it was committing unfair and deceptive acts and practices in violation of the UTPCPL.

131.   Based on the forgoing, PHEAA also violated the Pennsylvania Fair Credit Extension Uniformity Act ("FCEUA"), *see* 73 Pa. Stat. Ann. § 2270.5(a), by engaging in false, deceptive, and misleading representations and means, and unfair and unconscionable means in connection with the collection of alleged debts. *See* 73 Pa. Stat. Ann. § 2270.4(b)(5) and (6).

132.   PHEAA is a "creditor" and Plaintiff is a "consumer" under the FCEUA. *See* 73 Pa. Stat. Ann. § 2270.3.

133.   Plaintiff has suffered ascertainable loss as a result of PHEAA's violations of the FCEUA, which constitutes a violation of the UTPCPL.

134.   Accordingly, Plaintiff and individual class members are entitled to recover actual damages, punitive damages, statutory damages, treble damages, costs and reasonable attorneys' fees, and/or other additional relief as the Court deems necessary or proper.

## COUNT II

### *Breach of Contract Injuring Third-Party Beneficiary*

135.   Plaintiff incorporates the allegations contained in the previous paragraphs by reference.

136.   The Department of Education and PHEAA entered into a servicing

29

contract whereby PHEAA is contractually responsible for servicing federal student loans taken out by Plaintiff and the class members. The contract expounds that "[w]ith the sudden increase in current and potential loan volume that the Department will be responsible for servicing, the need for increasing the Title IV student aid servicing vehicles is…appropriate at this time."[19]

137.   As part of its contractual duties, PHEAA is obligated to utilize "efficient and effective commercial contract services to manage all types of Title IV student aid obligations, including, but not limited to, servicing and consolidation of outstanding debt." This includes "collection and default aversion activity on loans serviced under this contract as long as the loan remains on the servicer's systems."[20] In the supplemental additions to the Servicing Contract, the Government makes clear its goal to "promote the reduction of loan delinquency across the entire period of vender performance."

138.   PHEAA breached its contract with the Department of Education by failing to properly service borrowers' federal student loans and instead, focusing on its own profits.

139.   PHEAA failed to service borrowers' federal student loans properly by placing their accounts into forbearance and Administrative Forbearance when

---

[19]   *See* Solicitation/Contract/Order for Commercial Items, 19 (available at https://www2.ed.gov/policy/gen/leg/foia/contract/pheaa-061709.pdf) (last accessed Nov. 19, 2017).
[20]   *Id.*

necessary to accommodate PHEAA's own mismanagement or otherwise in violation of PHEAA's duty to borrowers. Rather than process borrowers' IDR Request Forms timely and properly, PHEAA placed their accounts into forbearance, causing Plaintiff and class members substantial, continuing harm. PHEAA's purpose in forcing these borrowers into forbearance was its own overall profit caused by limiting customer service expenses, and padding its long-term accounts receivable.

140. Plaintiff and the class members are intended third-party beneficiaries under the Servicing Contract. The Department specifically contracts with PHEAA for the purpose of servicing Plaintiff and the class members' federal student loans. In the Master Promissory Note ("MPN"), the contract between the borrower and the Department, the Department states a third-party may service the loan and directs borrowers to their servicers for loan-related issues. Again, after the loan repayment period has begun, the Department directs borrowers to contact their loan servicers for information about repayment issues, including IDR options. Since at least 2015, if not earlier, the Department has issued the following instruction to borrowers after submitting an IDR Request Form: "If you have questions regarding the next steps in the processing of your application, or wish to cancel the application, contact your servicer(s)."

141. Plaintiff and the class members relied on the contract between the Department and PHEAA when pursuing the repayment of their loans. Plaintiff and the class members' agreement with the Department, through the MPN, informed the

classes of their rights to loan service and that third-party servicers would service their federal loans. Plaintiff and the class members trusted and relied on PHEAA to adhere to its role as a servicer, including processing their IDR Request Forms timely and properly, and not push them into forbearance when PHEAA failed to do one or both.

142.   PHEAA's breaches cost borrowers significantly, including increasing the overall amounts borrowers have paid and owe on their loans, denying them the opportunity to take part in alternative repayment plans, delaying their opportunity to seek loan forgiveness, erasing reduced interest rates available to borrowers in repayment, exhausting future forbearance eligibility, forgoing Federal Interest Subsidies from the Department, and the addition of unpaid interest to the principal balance of their loans, thus increasing borrowers' monthly payment amounts.

143.   As a result of the foregoing, Plaintiffs and the class members are entitled to, among other things, compensatory damages and all other relief deemed just and equitable by the Court.

## COUNT III

### *Negligence*

144.   Plaintiff incorporates the allegations contained in the previous paragraphs by reference.

145.   PHEAA owed—and continues to owe—a duty to Plaintiff and the Class to use reasonable care in assisting student loan borrowers in choosing between

repayment options and processing their IDR Request Forms correctly and on time.

146. This duty arises from several sources, including, but not limited to, the sources described below and is independent of any duty PHEAA owed as a result of contracts between it and Plaintiff and the class members.

147. PHEAA has a common law duty to prevent the foreseeable risk of harm to others, including Plaintiff and the Class. Plaintiff has multiple student loans held by the Department of Education. The Department of Education has contracted with PHEAA to utilize "efficient and effective commercial contract services to manage all types of Title IV student aid obligations, including, but not limited to, servicing and consolidation of outstanding debt."

148. "With the sudden increase in current and potential loan volume" that PHEAA would be responsible for after executing its contract with the Department, it was foreseeable that, if reasonable measures were not taken, PHEAA would not be able to process Plaintiff's and the class members' IDR Request Forms correctly and on time. It was also foreseeable to PHEAA that injury would result from a failure to use reasonable measures to process borrowers' IDR Request Forms correctly and on time. To this end, it was foreseeable that if reasonable measures were not so taken, PHEAA's servicing failures would exhaust borrowers' future forbearance eligibility, block the Department of Education from paying Federal Interest Subsidies borrowers are entitled, deny borrowers the opportunity to participate in alternative payment plans, erase reduced interest rates available to borrowers in repayment, delay

borrowers' opportunity to seek loan forgiveness, add to borrowers' principal loan balance, and increase their monthly loan payments.

149.   PHEAA assumed a duty to use reasonable measures in servicing loans for the more than 7.6 million borrowers in its portfolio.

150.   In addition to its general duty to exercise reasonable care, PHEAA also had a duty of care as a result of the special relationship that existed between PHEAA and Plaintiff and the class members. The special relationship arose because the Department of Education entrusted PHEAA to utilize "efficient and effective commercial contract services to manage all types of Title IV student aid obligations, including, but not limited to, servicing and consolidation of outstanding debt." Only PHEAA was in a position to ensure that its servicing systems were sufficient to protect against the harm to Plaintiff and the class members from PHEAA's insufficient servicing measures.

151.   PHEAA's duty to use reasonable care in servicing Plaintiff's and the class members' loans also arose under the Pennsylvania Fair Credit Extension Uniformity Act ("FCEUA"), *see* 73 Pa. Stat. Ann. § 2270.4(b)(5) and (6), which prohibits the "use [of] any false, deceptive or misleading representation or means in connection with the collection of any debt," as well as the "use [of] unfair or conscionable means to collect or attempt to collect any debt," including "[t]he collection of any amount, including interest, fee, charge or expense incidental to the principal obligation, unless such amount is expressly authorized by the agreement

creating the debt or permitted by law."

152.   Finally, PHEAA's duty to use reasonable care in servicing IDR Request Forms arose not only as a result of the common law and the statutes described herein, but also because it was bound by, and had committed to comply with, industry standards, as represented by the Department of Education to borrowers, as well as in the Department's contract for services with PHEAA.

153.   PHEAA breached its common law, statutory, and other duties and thus was negligent by failing to use reasonable measures to service Plaintiffs' and the class members' loans correctly and on time. Upon information and belief, the specific negligent acts and omissions committed by PHEAA include, but are not limited to, some, or all, of the following:

   (a)   Placing borrowers' accounts into forbearance to accommodate its own servicing failures, or as a result of breaching its duty to assist borrowers;

   (b)   Denying borrowers the opportunity to make Qualifying Payments for PSLF and IDR forgiveness when it fails to timely and properly process IDR Request Forms, thereby extending the life of borrowers' loans;

   (c)   Failing to properly count borrowers' PSLF and IDR Qualifying Payments;

   (d)   Exhausting borrowers' eligibility to request forbearance in the future, when they may actually need it;

   (e)   Denying borrowers Federal Interest Subsidies the Department of

Education must make on their behalf;

(f)     Triggering the capitalization of borrowers' interest, thereby increasing borrowers' outstanding principal and monthly payment amounts;

(g)     Failing to educate borrowers about the consequences of switching repayment plans, including but not limited to borrowers having to choose between forbearance and the fixed, 10-year Standard Repayment Plan upon a change; and

(h)     Collecting amounts not legitimately due and owing and failing to refund them to borrowers.

154.   In connection with the conduct described above, PHEAA acted wantonly, recklessly, and with complete disregard for the consequences.

155.   As a direct and proximate result of PHEAA's negligent conduct, Plaintiff and the Class have suffered substantial losses as detailed herein.

## COUNT IV

### *Declaratory Judgment*

156.   Plaintiff incorporates the allegations contained in the previous paragraphs by reference.

157.   PHEAA's Servicing Contract with the Department of Education requires it to provide adequate and proper services related to federal student loan servicing. These services include, among other things, assistance in educating borrowers about their repayment options and assisting borrowers in determining appropriate repayment plans, as well as understanding the consequences of switching between

plans. Furthermore, PHEAA is compelled under the Servicing Contract to render these services without concerns of the cost, which the Department of Education can manage by adjusting the number of borrowers assigned to various servicers.

158.   Despite its obligations, PHEAA declined to fulfill its duties. Instead, PHEAA implemented an approach geared towards reducing its own costs while abandoning its role as a federal student loan servicer, a role that other servicers have adequately implemented. PHEAA, in the meantime, has ballooned to become one of the largest federal student loan servicers in the country, servicing over a quarter of the $1.4 trillion in student loan debt owed by millions of borrowers across the United States, in part through its approach of reducing costs related to student loan servicing.

159.   Plaintiff and the class members will continue to be harmed should PHEAA continue to implement its forced-forbearance approach while simultaneously asserting in public that it pursues the best repayment options for borrowers.

160.   As a result of the foregoing, Plaintiff and the class members are entitled to declaratory relief to prevent further harm. Namely, Plaintiff and the class members are entitled to a declaration that PHEAA has a contractual responsibility to fulfill its role as a proper student loan servicer and provide borrowers with assistance in understanding, choosing, and moving between repayment plans.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on her own behalf and on behalf of the class members,

prays for the following relief:

A.    An order that this action may proceed as a class action under the Federal Rule of Civil Procedure Rule 23 with Plaintiff as the Class Representative;

B.    An order declaring PHEAA's conduct as alleged herein is unlawful;

C.    An order enjoining PHEAA from continuing the unlawful practices alleged herein;

D.    An order awarding Plaintiff and the class members all damages to which they are entitled under the law, along with pre- and post-judgment interest;

E.    An order granting Plaintiff and the class members the costs of the suit, including reasonable attorneys' fees and expenses as allowed by law; and,

F.    An order awarding any other further relief to which Plaintiff and the class members may be entitled.

## **JURY DEMAND**

Plaintiff respectfully demands a jury trial on all matters so triable.

Respectfully submitted,

Dated: December 29, 2017

*/s/ Gary F. Lynch*

Gary F. Lynch (Pa. ID 56887)
Kevin W. Tucker (Pa. ID 312144)
**CARLSON LYNCH SWEET KILPELA & CARPENTER, LLP**
1133 Penn Avenue, 5th Floor

Pittsburgh, PA 15222
T. (412) 322-9243
glynch@carlsonlynch.com
ktucker@carlsonlynch.com

Bryan L. Bleichner
Gary K. Luloff
**CHESTNUT CAMBRONNE PA**
17 Washington Avenue North - Suite 300
Minneapolis, Minnesota 55401
T. (612) 339-7300
F. (612) 336-2940
bbleichner@chestnutcambronne.com
gluloff@chestnutcambronne.com

Brian C. Gudmundson
Michael J. Laird
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
T. (612) 341-0400
F. (612) 341-0844
brian.gudmundson@zimmreed.com
michael.laird@zimmreed.com

Arthur M. Murray
**MURRAY LAW FIRM**
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 525-8100
Facsimile: (504) 584-5249
amurray@murray-lawfirm.com

*Counsel for Plaintiff*